**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DENVER, COLORADO DIVISION**

Civil Action No. _____

ROBERT R and JULIE R., as Individuals
and as Parents and Guardian of DYLAN
a disabled adult

PLAINTIFFS,

v.


JEFFERSON COUNTY SCHOOL DISTRICT R-1,
LYNN TORR, in his official capacity as a principal,
LIZ COLE, in her official capacity as an assistant principal who oversaw special education in
ninth and tenth grade years,
OCTOBER MINNOTTE, in her official capacity as assistant principal and Diverse Learners
Team and oversaw eleventh-grade special education,
CYNTHIA DOMINGUEZ, in her official capacity as a special education teacher,
BRIAN GRUDOWSKI, in his official capacity as a special education teacher,
ASHLEY EIDMANN, in her official capacity as a mental health provider,
John and Jane Does in their official capacity as paraprofessionals, teachers, and staff,

DEFENDANTS.


**COMPLAINT AND JURY DEMAND**

PLAINTIFFS, bring this action against DEFENDANTS for their violations of DYLAN's rights

under Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq*., and

violations of his rights to equal protection of the laws under the Fourteenth Amendment to the

U.S. Constitution and federal rights under Title IX, pursuant to 42 U.S.C. § 1983.

## JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331 because this litigation involves matters of federal law, including: claims made under the Education Amendments of 1972 (Title IX), 20 U.S.C. § 1681 *et seq.*; and claims for deprivation of civil rights under 42 U.S.C. § 1983 and the United States Constitution.

2. The Supreme Court has held that Title IX includes a private right of action for money damages. *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 76, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992).

3. This Court also has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1343(a)(3) & (4) because this litigation involves claims for deprivation of civil rights under 42 U.S.C. § 1983 and seeks to recover damages or equitable relief or other relief provided under an Act of Congress for the protection of civil rights.

4. Venue in this District is proper as all Parties are located in this District, and all the relevant facts occurred in this District.

## PARTIES

5. Plaintiff, DYLAN is a current student of Jefferson County School District R-1 ("the DISTRICT").  DYLAN is a student with a disability pursuant to the Individuals with

Disabilities Education Act ("IDEA"), the Rehabilitation Act ("504"), and the Americans with Disabilities Act ("ADA").

6. He attended Bear Creek High School ("Bear Creek") in Jefferson County School District as a freshman, sophomore, and fall semester of his junior year.  DYLAN was a minor when he suffered sexual assault, sexual harassment, and sex discrimination at Bear Creek.  DYLAN is a resident of Jefferson County, Colorado.

7. DYLAN is now in twelfth grade.  He attends Lakewood High School, a public high school operated by Jefferson County School District.  He is 18 years old and resides with his parents in Jefferson County, Colorado.  This Complaint is filed within the applicable statute of limitations.

8. Plaintiffs ROBERT R. and JULIE R. are the parents and guardians of DYLAN.  They have resided in Jefferson County, Colorado since they enrolled DYLAN in the DISTRICT in the Fall of 2015.

9. DEFENDANT Jefferson County School District is a recipient of federal funds within the meaning of 20 U.S.C. § 1681, *et seq.* The DISTRICT geographically lies within Jefferson County, Colorado.

10. Individual DEFENDANTS were employed by Jefferson County School District and were acting under color of law when they denied DYLAN his rights to a public education free of sexual harassment and assault.

**FACTS**

*DYLAN is a disabled student and needed DEFENDANTS to protect him from a sexually aggressive peer which they failed to do.*

11. DYLAN is diagnosed with Down Syndrome.

12. The DISTRICT completed an Evaluation Report on September 25, 2018, as part of triannual review as required under the Individuals with Disabilities Education Act. 20 U.S.C § 1400 *et seq*.. The following information was included in the report.

    a. ASHLEY EIDMANN, LSW administered to D.R the Kaufman Assessment Battery for Children -second addition ("KABC-II") in April 2013. DYLAN's full composite index score was 59, which falls in the intellectually deficient range.

    b. On September 24 2018, EIDMANN reported on results from assessments that she had given DYLAN. EIDMANN administered the Adaptive Behavior Assessment System, 3rd edition ("ABAS-3"). The ABAS -3 assesses how well an individual can care for oneself, respond to others, and meet various environmental demands

at home and in school.  DOMINGUEZ, one of DYLAN's teachers, and DYLAN's mother completed the assessment.

c.   Index scores ranges are: 120 and above are high; 110-119 are above average; 90-119 are average; 79-70 are low; and 69 and below are extremely low.

d.   Both raters scored DYLAN as having Extremely Low skills in conceptual and practical adaptive skills and low social skills.

e.   Both raters identified DYLAN as having an Extremely Low General Adaptive Composite score.  DOMINGUEZ rated DYLAN with a standard score of 59, ten points below the cut-off which identifies someone as having extremely low skills.

f.   Although DYLAN has profoundly low adaptive skills in all areas, his areas of greatest weakness include Health and Safety, Community Use, and Self-Direction.

g.   Health and Safety skills are those needed for engaging in and planning leisure and recreational activities, including playing with others, engaging in recreation, and the ability to follow rules in games.

h.  Community Use are skills needed to function in the community.  Self Direction
are skills needed for independence, responsibility, and self-control, including
starting and completing tasks, keeping a schedule, following time limits,
following directions, and making choices.

i.  The ABAS -3 shows that DYLAN'S most severe deficits are in his ability to be
safe in the community and to act independently.

j.  LINSAY WICKLER, MS SLP-CF assessed DYLAN's language skills on
September 20 and 28, 2018.  She administered the Clinical Evaluation of
Language Fundamentals -5[th] edition (CELF-5) to DYLAN.

k.  DYLAN received a Core Language Score of 56, a percentile rank of 0.2%
compared to typical peers.  Based on this score, DYLAN has significant deficits
in his language functioning.

13. The DISTRICT convened an IEP meeting to review the results of the Evaluation Report.
DOMINGUEZ, GRODOWSKI, and EIDMANN attended or were involved with
developing the IEP, as well as others from the DISTRICT.  As a result of that meeting,
the DISTRICT identified DYLAN as a student eligible to continue to receive services
pursuant to IDEA due to multiple disabilities.  DYLAN met the criteria of having

multiple disabilities because he has an intellectual disability and a speech language disability.  See 34 C.F.R. § 300.9(c )(7).

14. The DISTRICT wrote an Individualized Educational Plan ("IEP"), which is dated September 26, 2018 and was in effect when DYLAN was sexually assaulted at Bear Creek.  The 2018 IEP provided DYLAN access to general education classes 40-79% of the time.  He also received services in the Significant Support Needs Level 3 program ("SSN-3").

15. Due to his disabilities, DYLAN takes alternate assessments.  He is not taught grade-level curriculum, but learns skills based on his unique needs.

16. The DEFENDANTS knew that DYLAN has limited language skills and lacks the adaptive skills needed to function safely without support.  His September 2018 IEP provided mental health supports to meet with DYLAN individually and group therapy, as part of a Boys' Group.  The purpose of the support was to help build pro-social skills including, but not limited to, developing appropriate social skills, identifying and managing emotions, identifying social cues, and problem-solving.

*The Sexual Assault*

17. A female student (hereinafter referred to as "K") received services in the Significant Support Needs level 3 classroom ("SSN-3") with DYLAN.  K had a history of sexual aggression towards DYLAN.

18. On or about December 18, 2018, K followed DYLAN down a hallway.  DYLAN entered the boys' bathroom.  K followed DYLAN into the bathroom.

19. K pushed DYLAN into one of the stalls, closed the door behind her, locked the door, and stood in front of the door and prevented DYLAN from leaving.

20. She pulled DYLAN's pants down.  DYLAN yelled at her to stop.  K refused.  K then placed her mouth on DYLAN's penis.

21. Two other students entered the bathroom and knew something was not right and reported their concerns to security.

22. Security entered the bathroom, announced himself.  K was still blocking the door, but DYLAN escaped by crawling under the bathroom stall.

23. Security did not interview DYLAN nor K but told them both to go to class.

24. Later that day, K's art teacher overheard K bragging to peers about her sexual acts against DYLAN. The art teacher reported what she heard to one of the special education teachers in the SSN classroom, CYNTHIA DOMINGUEZ.

25. DOMINGUEZ pulled DYLAN from his class and questioned him.  DYLAN told DOMINGUEZ what K had done to him.  She then instructed him to return to class.

26. A short time later, DOMINGUEZ again entered DYLAN's class and had with her the other teacher from the SSN classroom, GRUDOWSKI.  Both teachers again interviewed DYLAN.  DYLAN repeated that K had followed him into the boys' bathroom, pushed him into the bathroom stall, prevented him from leaving, that he told her to stop but instead she pulled down his pants and put "her mouth on his junk."

27. Despite two separate interviews, Bear Creek staff waited until after school had ended to make a report to the Security Resource Officer ("SRO") assigned to Bear Creek.  They left a message for the SRO telling him that there might be an 'issue' and did not speak to the SRO until the next day.

28. DOMINGUEZ and OCTOBER MINNOTTE did not notify DYLAN's parents of the assault until the end of the school day.

29. Security never reported the assault to the Security Resource Officer (SRO), even though he is a mandatory reporter under C.R.S. 19-3-304(2)(l).[1]

30. The DISTRICT and MINNOTTE failed to conduct a thorough investigation as required in Title IX.

31. The DISTRICT and MINNOTTE failed to identify possible witnesses.

32. The DISTRICT and MINNOTTE failed to identify and question either of the two students who entered the boy's bathroom and reported their concerns to security.

33. The DISTRICT and MINNOTTE failed to interview K on the day of the incident.

34. When DYLAN returned home that afternoon, he sat with his head down on a table and cried. He kept repeating what had happened to him in the same manner.

35. DOMINGUEZ told DYLAN'S parents that she believed DYLAN when he stated that he had not consented to the sexual act.

36. DEFENDANTS had proven that they could not keep DYLAN safe at school.  Since K continued attending Bear Creek and continued receiving her education in the same

---

[1] Bear Creek had both "Security" who are employees hired by the District, as well as, Lakewood City police officers who are referred to as Security Resource Officers or SROs.

classes as DYLAN, ROBERT R. and JULIE R. were forced to find a different school for DYLAN

37. Following this incident, DYLAN stayed home for two and a half months while waiting for Defendants to develop a new school plan for him. DYLAN missed participating in unified basketball, the school play, and other school activities.

38. DYLAN interpreted this transfer as a "punishment" since the perpetrator stayed at the Bear Creek, and he had to leave his friends and a familiar setting and attend a different high school.

***DEFENDANTS Had Prior Notice that DYLAN Was at Risk of Being Exposed to Sexual Aggression and Failed to Act.***

39. In the Spring semester 2017, DYLAN and K had a drama class together in their freshman year of high school.

40. On at least one occasion, DYLAN and K left drama class without seeking permission and had no adult supervision.

41. On one of these occasions, a District employee, believed to be the paraprofessional assigned to provide supervision, found K and DYLAN in the empty theater.  K was lying on top of DYLAN and kissing him. K was significantly larger and heavier than DYLAN.

42. DEFENDANTS failed to ensure DYLAN'S safety while in drama class.  In the service

    delivery statement of the September 2016 IEP in effect at that time of this incident, the

    DISTRICT had committed to provide DYLAN with paraprofessional support in the

    SSN3 classroom and in the general education classroom.  Either the paraprofessional was

    not provided during drama class or had utterly failed to provide the most basic

    supervision.

43. ROBERT R. and JULIE R., the parents of DYLAN complained to staff, administration,

    and in IEP meetings of their concerns about DYLAN's safety, concerns about K's sexual

    aggression, and concerns about the impact on DYLAN's development if exposed to

    sexual acts.  Some of those in attendance at these meetings include: DOMINGUEZ,

    GRUDOWSKI, EIDMANN, and JOHN AND JANE DOES in their official capacities as

    teachers and staff at Bear Creek.

44. ROBERT R. and JULIE R. repeatedly asked DEFENDANTS to develop a plan to keep

    DYLAN safe and to keep K away from DYLAN.

45. DEFENDANTS refused to take steps to protect DYLAN.

46. K continued to harass DYLAN throughout high school.  She sent him notes asking to be

    his girlfriend.  K sent notes asking DYLAN to marry her, to have babies together, and to

sleep together.  K sent notes telling DYLAN that she loved him and missed him and wanted them to be together and to ignore his parents' advice.  K frequently told DYLAN that she loved him and that she could not let him go.

47. In addition to notes, DYLAN was often exposed to inappropriate statements made by K such as "I want you to put your junk in my junk."  These comments happened during class despite the presence of teachers, para-professionals, and other students.

48. On multiple occasions ROBERT R. and JULIE R. informed DEFENDANTS of their ongoing concerns for DYLAN's safety and their desire to limit DYLAN's exposure to sexual activity in school.  DEFENDANTS again refused to act and did not take parents' concerns seriously.

49. DEFENDANTS had authority over the placement, location, and schedule of both DYLAN and K's educational services.   Neither DYLAN nor his parents have the authority and control over which school DYLAN attends.

50. DEFENDANT has a special relationship to DYLAN as a child with multiple disabilities as defined in IDEA and under Section 504 of the Rehabilitation Act and even more so since he is known to have a high need for adult supervision and to lack the skills necessary to protect himself.

51. DEFENDANT acted with deliberate indifference to DYLAN's safety when it repeatedly placed both students in the same location, program, and classes.

52. DEFENDANTS created a dangerous situation for DYLAN when it knowingly placed DYLAN and K in the same location, programs, and classes.

53. The DISTRICT has a school policy that requires it to provide an educational environment free of sexual harassment.  DEFENDANTS failed to enforce the DISTRICT'S disciplinary, anti-harassment, and anti-discrimination, and anti-bullying polices to prevent physical and emotional harm to DYLAN.

54. DYLAN had a reasonable belief that he would be protected under the DISTRICT's policies.

55. DEFENDANT showed gender bias by failing to label sexual acting out as abusive since the perpetrator is female and victim is male.

56. Upon information and belief, other students taught in the SSN classroom of Bear Creek had complained to teachers and staff of sexual harassment in the SSN classroom.  Yet, the hostile educational environment continued over years.

***Due to Defendants' Deliberate Indifference to DYLAN's Safety and Affirmative Acts,
They Knowingly Placed DYLAN at Risk and Caused Him Irreparable Harm.***

57. Following the sexual assault, DYLAN's attitude toward sex changed.  Prior to the sexual assault, DYLAN wanted to get married and live independently, but now, he envisions his future "living alone in an apartment."

58. Sometime after the assault, DYLAN began searching for inappropriate material on the Internet. He viewed sex on the Internet and decided he never wanted to do those things.

59. DYLAN has frightening nightmares about Bear Creek and Lakewood High Schools. These dreams are often about escaping and trying to figure out, "how I could have gotten out of the stall."  DYLAN has difficulty sleeping since the attack.

60. The sexual assault has created a heightened anxiety and anger that typically manifests itself in irritability and temper tantrums.

61. Behaviors of girls in DYLAN's current educational setting at Lakewood High School trigger him and cause him to remember the abusive incidents at Bear Creek.  Individuals who have experienced a traumatic event often are over-stimulated and activated by similar events in another setting and time.

62. DYLAN now suffers from Post-Traumatic Stress Disorder (PTSD) as classified by the Diagnostic Statistical Manual for Mental Disorders, Fifth Edition (DSM-V).

63. For a diagnosis of PTSD to be made, the individual must have been exposed to a traumatic event. The DSM-V has included sexual violence as a definable traumatic event. The incident at Bear Creek when DYLAN was forced into a bathroom stall, had his pants pulled down, and the perpetrator put his penis in her mouth can clearly be considered sexual abuse.  Therefore, it meets the criteria for a traumatic event.

64. Diagnosis of PTSD in the DSM-V also requires that the individual has unwanted re-experiencing of the event. DYLAN's nightmares, his admission that he cannot get what happened to him out of his mind and the observable emotional distress he exhibited after talking about the event, are examples of this re-experiencing of the trauma.

65. A traumatized individual also seeks to avoid all reminders of the trauma.  DYLAN described this tendency when he said he used his imagination to pretend that the events of December 2018 "didn't happen."

66. The sexual assault at Bear Creek, created significant changes in DYLAN. Prior to the incident, DYLAN admitted that, at some point in time, he wanted to have a girlfriend and perhaps marry. Following the assault, DYLAN stated he does not want to have a girlfriend because it would mean he would have to have sex. He now sees himself living

alone. These types of changes are found in PTSD sufferers who no longer look forward to activities they once believed they could enjoy.

67. DYLAN's admittance to having temper tantrums and participating in risky behaviors, such as searching for pornography on the computer and exposing himself to a female student on a bus, are examples of heightened arousal and a need for increased stimulation, both of which result from sexual abuse. DYLAN's problems sleeping also indicate hyper arousal and anxiety, which are common symptoms of PTSD.

68. Of the population of children who abuse other children, a majority of them have themselves been sexually abused. Sexual abuse heightens children's sexuality and can cause them to perpetrate on others in a similar fashion that was done to them.

69. DYLAN's Down Syndrome makes it more difficult for him to process the abuse and control his impulses. Therefore, he is at risk for acting out his sexual abuse on other children and this creates a difficulty for his parents and future community service providers.

70. It is doubtful DYLAN will be able to live independently until he has successfully completed a course of therapy that would address the trauma he has experienced and ensure his safety and the safety of others.

71. Due to DYLAN's intellectual disability, he is eligible to receive adult disability services, including eligibility to live in a group home or other community housing specifically designed for those with multiple disabilities.  The harm caused to DYLAN creates a significant risk of limiting his eligibility for group homes and his ability to live away from his parents.

72. Any changes in DYLAN's ability to access adult services will greatly impact his quality of life and the lives of his parents, ROBERT R. and JULIE R.

73. DYLAN was a well-adjusted, well-liked, and happy young man prior to the sexual assault. He aspired to having a girlfriend and living independently. Since the sexual assault, there has been a marked change in how he views the world and how he views himself.

74. DYLAN does not feel safe in his environment at Lakewood High because his relationship with some of the girls in his class is triggering too many memories of what occurred at Bear Creek.

75. DYLAN also engages in a lot of bargaining and wishful thinking, and continues to have regrets about leaving Bear Creek. Much of DYLAN's wishful thinking includes a desire to do something differently so the assault would not have happened. This is a common

response for survivors of sexual abuse who tend to blame themselves and feel guilty

about the abuse.

76. DYLAN's self-esteem has suffered as a result of the sexual assault. He told his parents he

feels "stupid" and complained of not being as smart as everyone else. Low self-esteem is

often found in sexual abuse survivors since the victim experienced a sense of

powerlessness and shame during the abusive acts.

### DEFENDANTS were Deliberately Indifferent to DYLAN's Clearly Established Right to be Free from Sexual Harassment at School.

77. DYLAN had a clearly established right to be free from sexual harassment in school.

78. DEFENDANTS knew or should have known that they were legally obligated to prevent

and remedy sexual harassment in their schools.

79. In 1998, the U.S. Supreme Court stated, "[t]he number of reported cases involving sexual

harassment of students in schools confirms that harassment unfortunately is an all too

common aspect of the educational experience." *Gebser v. Lago Vista Indep. Sch. Dist.,*

524 U.S. 274, 292 (1998).

80. In 1999, the U.S. Supreme Court determined that schools may be held liable in private

Title IX actions for monetary damages when they are deliberately indifferent to student-

against-student sexual misconduct and harassment. *See Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629 (1999).

81. In January 2001, the U.S. Department of Education Office for Civil Rights ("OCR") issued Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties ("2001 OCR Guidance"), informing all U.S. schools receiving Federal financial assistance, including Defendant, that "[p]reventing and remedying sexual harassment in schools is essential to ensuring a safe environment in which students can learn." OCR reminded schools that student-against-student sexual misconduct constitutes prohibited sexual harassment.

82. The 2001 OCR Guidance stated, with respect to student-against-student sexual harassment: "If a student sexually harasses another student and the harassing conduct is sufficiently serious to deny or limit the student's ability to participate in or benefit from the program, and the schools knows … about the harassment the school is responsible for taking immediate effective action to eliminate the hostile environment and prevent its recurrence… [I]f, upon notice, the school fails to take prompt, effective action the school's own inaction has permitted the student to be subjected to a hostile environment."

83. In January 2006, OCR issued a *Dear Colleague Letter – Sexual Harassment Issues*, to U.S. public schools, including Defendant, stating, "[u]nfortunately, a significant number of students are still subjected to sexual harassment which can interfere with a student's

education as well as his or her emotional and physical well-being." OCR reminded public

schools of their obligation "to take immediate and effective steps to end sexual

harassment when it occurs, prevent its recurrence, and remedy its effects."

## GENERAL ALLEGATIONS

### COUNT I

**Violation of the Educational Amendments of 1972 (Title IX), 20 U.S.C. § 1681, *et seq.***

84. Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully stated herein.

85. DEFENDANTS had actual knowledge of K's ongoing harassment and DYLAN's parents' many requests for assistance.

86. Parents notified DYLAN's case manager and special education teachers specifically of their concerns for DYLAN and provided notice to the many providers and administrators at DYLAN's IEP meetings and parent conferences about their concerns and the desire for the DISTRICT to take action to protect DYLAN, including those named individually.

87. DEFENDANTS had the authority, ability, and duty to investigate, and to take meaningful corrective action to remediate the sexual harassment that DYLAN suffered.  But the DEFENDANTS refused to protect DYLAN.

88. Special education teachers and others at Bear Creek and the DISTRICT exercise greater control over students placed in the SSN – 3 classroom as compared to other students.

89. The DISTRICT is deemed to have notice of harassment when it is reported to staff that exercise control over the harasser and the context in which the harassment occurred.

90. DEFENDANTS exercised substantial control over both the harasser and the context in which the known harassment occurred since all instances of harassment occurred at Bear Creek, during school hours, and occurred between two children placed in the SSN-3 classroom.

91. Upon information and belief, DEFENDANTS knew of other incidents of sexual harassment in the SSN-3 classroom at Bear Creek

92. DEFENDANTS had actual knowledge of K's ongoing sexual harassment of DYLAN.

93. DEFENDANTS acted with deliberate indifference to the harassment and the hostile environment and risk it created for DYLAN.

94. DYLAN suffered student-against-student sexual assault and harassment, which is considered sex discrimination prohibited by Title IX.  The DISTRICT continued to place K and DYLAN is the same special education and general education classes and failed to create a safety plan despite having more control of students in the SSN-3 classroom than those students with no or less severe disabilities and knowing that K had a history of sexual aggression towards DYLAN and may also have a history of sexual aggression toward other students.

95. DEFENDANTS' failure to take meaningful disciplinary or protective action was clearly unreasonable in light of DYLAN's known vulnerabilities.

96. Through its actions and inaction, DEFENDANTS were deliberately indifferent to the sexual harassment and sexual assault and hostile educational environment that DYLAN suffered at Bear Creek, and proximately caused severe harm to DYLAN.

97. The sexual harassment and assault inflicted on DYLAN was severe, pervasive, objectively offensive, and effectively barred DYLAN's access to educational opportunities and benefits.

98. DYLAN was forced to leave his familiar school and friends and was left without an educational placement for two months while a new placement was identified.

99. By its actions and inaction, Defendant acted with deliberate indifference to the rights of DYLAN to a safe and secure educational environment, thus materially impairing his ability to pursue an education at Bear Creek in violation of Title IX.

100. As a direct and proximate result of such misconduct and deliberate indifference, DYLAN sustained and continues to sustain injuries for which he is entitled to be compensated.

COUNT II
**Violation of 42 U.S.C. § 1983**
**State Created Danger**

101. Plaintiff incorporates all preceding paragraphs into the Count by reference as though fully restated herein.

102. The teachers and staff to whom DYLAN and his parents reported the sexual harassment and assault were at all relevant times employees of the DISTRICT, acting under color of state law, empowered and required by the State of Colorado to, among other things, ensure an open and safe environment for educational services.

103. DEFENDANTS had direct knowledge that K had previously sexually harassed and assaulted DYLAN.

104. DEFENDANTS had direct knowledge from their own evaluations that DYLAN had an exceptionally high need for assistance with safety in the school environment and required adult support.

105. DEFENDANTS created a danger through placing DYLAN and K in the same program, location, and classes, while taking to no steps to ensure DYLAN's safety.

106. Upon information and belief, the bathroom where the assault took place was known to DEFENDANTS as the location of other incidents of harassment and other serious rule violations.

107. The DISTRICT'S custody and control over the placement and schedule of both students, combined with DEFENDANTS' knowledge of DYLAN's significant impairments in the domains of safety and communication created a special relationship whereby the DISTRICT was required to protect DYLAN and provide for his need for safety.

108. DEFENDANTS created a dangerous situation for DYLAN by affirmatively placing him in frequent unmonitored contact with K, thus failing to provide a safe environment and unlawfully denying DYLAN his educational rights.

109. The DISTRICT'S teachers and employees had actual knowledge of the harassment DYLAN was experiencing and the deprivation of his constitutionally protected property interests in educational benefits.

110. DEFENDANTS had direct knowledge from their own evaluations that DYLAN had an exceptionally high need for assistance with safety in the school environment and required adult support.

111. DEFENDANTS' practices directly created the danger of improper conduct, including sexual abuse, which danger was realized by DYLAN.

112. DYLAN did not have the freedom to choose his classes or school of attendance or act on his behalf.

113. DEFENDANTS created the danger or increased the danger to DYLAN of being sexually assaulted and harassed when DEFENDANTS assigned him and K to be in classes together and to be unsupervised during unstructured time.

114. DEFENDANTS controlled where and how K and DYLAN received their education, special education, related services, and opportunities to interact with typical peers to be consistent with their Individual Education Programs.

115. DYLAN, as a student with multiple disabilities, was assigned to receive services through the SSN-3 classroom at Bear Creek is therefore part of specific definable group.

116. By continuing to implement the IEP's for K and DYLAN without considering the risk to DYLAN, DEFENDANTS' conduct put the DYLAN at substantial risk of serious, immediate, and proximate harm.

117. DEFENDANTS refusal to create a safety plan, to take remedial steps, and by continuing to place K and DYLAN in classes together and allow unstructured time at school together put DYLAN at substantial risk of serious, immediate, and proximate harm.

118. The risk was obvious, given K's ongoing harassment, and especially in light of each child's significant disabilities.

119. DEFENDANTS acted recklessly and in conscious disregard to the risk by ignoring the harassment.

120. Unlike typical peers, the DISTRICT is required to meet annually with parents and teens to discuss areas of need and to learn about parents' concerns. DEFENDANTS' failure to act, choosing to ignore the harassment, and to knowingly continuing to place the children in the same classes and program is conscience shocking.

121. As a direct and proximate result of such misconduct and deliberate indifference, DYLAN sustained and continues to sustain injuries for which he is entitled to be compensated.

COUNT III

**Violation of 42 U.S.C. § 1983**

**Deprivation of Educational Property Rights – Failure to Train**

122. Plaintiff incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

123. At all relevant times, the DISTRICT had a duty to train teachers and employees concerning the policies on reporting known or suspected abuse of students like DYLAN.

124. Specifically, the security officer who found DYLAN and K in the bathroom, failed to obtain the identity of the reporting student, failed to report the incident, instructed DYLAN and K to return to class, and failed to report the incident to police.

125. Upon learning of parents' concerns regarding DYLAN's safety in regards to K's sexual aggression, the DISTRICT failed to conduct adequate training which resulted in the team's failure to change either students' programming.

126. The DISTRICT failed to train teachers and employees regarding the risks to DYLAN in light of his specific disabilities and how to take effective remedial responses to sexual harassment between students assigned to receive services in the SSN-3 classroom.

127. At all relevant times, the DISTRICT had a duty to train teachers and employees concerning signs of abuse and inappropriate conduct by students toward one another.

128. At all relevant times, the DISTRICT had a duty to train teachers and employees regarding written policies that would prevent or prohibit actions like those taken against DYLAN.

129. The DISTRICT's failure to train effectively denied DYLAN constitutionally protected educational property rights.

130. The DISTRICT's denial of DYLAN's educational rights violated his substantive due process rights under the Fourteenth Amendment to the United States Constitution, and directly and proximately caused great injury and damage to these rights and liberty interests, for which he is entitled to compensatory and exemplary damages.

131. As a direct and proximate result of this failure to train, DYLAN sustained and continues to sustain injuries for which he is entitled to be compensated

COUNT IV

**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. §794**

132. DYLAN is a student with a disability as defined by section 504 of the Rehabilitation Act.

133. When DYLAN's parents reported their concerns about the sexual aggression of K, DEFENDANTS continued to place K and DYLAN in the same small classroom and in the same classes.

134. DEFENDANTS would have created a safety plan and taken remedial steps if not for K and DYLAN being students with disabilities assigned to receive services from the same SSN-3 classroom.

135. Individual DEFENDANTS, while acting under color of state law, discriminated against DYLAN who is a member of an identifiable class.

136. DEFENDANTS failed to take any disciplinary action or other remedial steps which is sufficient to infer deliberate indifference.

137. DEFENDANTS failed to investigate the concerns that the parents raised and failed stop the harassment supports a finding of deliberate indifference.

138. If DEFENDANTS took any remedial steps, their failure to take any further steps once they knew the remedial measures were inadequate supports a finding of deliberate indifference.

COUNT V

**Violation of Parents Rights under Section 504 of the Rehabilitation Act, 29 U.S.C. §794**

139. PLAINTIFF incorporates all preceding paragraphs into this Count by reference as though fully restated herein.

140. Section 504 of the Rehabilitation Act ("504") provides a remedy for "any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistant under section 794 of this title."

141. "A parent of a child with a disability has a particular and personal interest in preventing discrimination against that child." *A. M. v. NYC Dept. of Educ.,* 840 F.Supp. 2d 660 (E.D.N.Y. 2012)(quoting *Winkelman v. Parma City Sch. Dist.* , 550 U.S. 516, 529 (2007).

142. ROBERT R. and JULIE R., as the parents and guardians and primary caregivers of DYLAN, have been aggrieved by the DEFENDANTS disability discrimination against DYLAN.

143. The discrimination by DEFENDANTS against DYLAN has done significant harm to ROBERT R. and JULIE R.

144. Among other things, DYLAN was out of school for two months because DEFENDANTS refused to move the perpetrator to a new school.  While out of school he required full-time care from his family.

145. ROBERT R. and JULIE R. relationship with DYLAN has changed since the assault due to the increase in negative behaviors as a result form the P.T.S.D.  He is not the same happy person prior to the assault.

146. The emotional and behavioral harm done to DYLAN, is continuing to cause stress, anxiety, disruption, and considerable expense to his parents.

## REMEDIES

147.    DYLAN sustained and continues to sustain injuries for which he is entitled to be

compensated, including but not limited to:

      (a)  past, present, and future physical and psychological pain, suffering, and

           impairment;

      (b)  medical bills, counseling, and other costs and expenses for past and future

           medical and psychological care;

      (c)  impaired educational capacity;

      (d)  exemplary damages;

      (e)  attorneys' fees and costs; and

      (f)  such other and further relief that this Court deems just and proper.


147.    ROBERT R. and JULIE R. have sustained and continued to sustain injuries for which

they are entitled to be compensated, including but not limited to:

      (a)  past, present, and future physical and psychological pain, suffering, and

           impairment;

      (b)  medical bills, counseling, and other costs and expenses for past and future

           medical and psychological care;

      (c)  exemplary damages;

      (d)  attorneys' fees and costs; and

      (e)  such other and further relief that this Court deems just and proper.

Respectfully submitted this 1st day of June, 2020.

s/ Elena Eisenberg
**_Elena Eisenberg_**
Attorney # 22217
Education Law Offices, LLC
357 McCaslin Boulevard, Suite 100
Louisville, CO 80027
Telephone: (303) 325-3329
FAX: (303) 926-5211
E-mail: elena@educationlaw.co
Attorney for Plaintiffs

s/ Kate Gerland
**_Kate Gerland_**
Attorney #24565
Education Law Offices, LLC
357 McCaslin Boulevard, Suite 100
Louisville, CO 80027
Telephone: (303) 325-3329
FAX: (303) 926-5211
E-mail: kate@educationlaw.co
Attorney for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2020, a true and complete copy of the Complaint and Jury

Demand was filed through CM/ECF and served on all parties via U.S. Mail:

Craig Hess, Chief Legal Counsel
Jefferson County Public Schools
829 Denver West Drive, Building 27
Golden, Colorado 80401-0001

Lynn Torr, Principal
Bear Creek High School
c/o Superintendent's District Office
829 Denver West Drive, Building 27
Golden, 80401-0001

Liz Cole, Assistant Principal
Bear Creek High School
c/o Superintendent's District Office
829 Denver West Drive, Building 27
Golden, Colorado 80401-0001

October Minnotte, Assistant Principal
Bear Creek High School
c/o Superintendent's District Office
829 Denver West Drive, Building 27
Golden, Colorado 80401-0001

Cynthia Dominguez, Special Education Teacher
Bear Creek High School
c/o Superintendent's District Office
829 Denver West Drive, Building 27
Golden, Colorado 80401-0001

Brian Grudowski, Special Education Teacher
Bear Creek High School
c/o Superintendent's District Office
829 Denver West Drive, Building 27
Golden, Colorado 80401-0001

Ashley Eidmann, Mental Health Provider
Bear Creek High School
c/o Superintendent's District Office
829 Denver West Drive, Building 27
Golden, Colorado 80401-0001

*s/Anjanette Mantooth*
Anjanette Mantooth, Paralegal